Theotis TOLLIVER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A03–0906–CR–250.

Court of Appeals of Indiana.

March 18, 2010.

Transfer Denied May 20, 2010.

Charles E. Stewart, Jr., Appellate Public Defender, Crown Point, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Michael Gene Worden, Nicole Dongieux Wiggins, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Appellant–Defendant Theotis Tolliver appeals his conviction, following a jury trial, for Murder, a felony,[1] and the finding that he is a Habitual Offender.[2] Upon appeal, Tolliver challenges his conviction and habitual offender status by claiming the trial court erred on the following grounds: (1) by permitting a police officer to testify, based upon the victim's body language, about what Tolliver alleges to be the "cooperative and truthful" nature of certain statements by the victim; (2) by allowing into evidence certain victim statements as statements against interest pursuant to Indiana Evidence Rule 804(b)(3); (3) by denying his motion for a continuance when a defense witness failed to appear at trial; and (4) by prohibiting defense counsel from inquiring into certain State's wit-

nesses' possible bias or ulterior motives on cross-examination. We affirm.

## FACTS AND PROCEDURAL HISTORY

### I. Facts

At some point after noon on September 15, 2008, Benjamin Woodard, Jr. and two other individuals named Jontae Smith and Jeremy, happened upon Vondell Henry, who was having car trouble at the intersection of 16th and Broadway Streets in Gary. Woodard and his companions approached Henry and waited with him until the car was fixed. The group then went to Jeremy's home at 13th and Pennsylvania Streets, by Washington Park, where they gambled with dice. Tolliver and another individual named Mike later joined them. Tolliver pulled out the gun he was carrying and placed it on the floor. According to Henry, the gun looked like a ".25 or .32" and appeared to be semiautomatic. Tr. p. 351. During the dice game, Tolliver and Woodard exchanged heated words, causing Tolliver to leave the game twice.

After leaving the dice game the second time, Tolliver went to Gerald Bailey Jr.'s home on Connecticut Street and indicated that he was angry at Woodard. Between 7:00 and 9:00 p.m., Bailey and Tolliver returned to the home at the intersection of 13th and Pennsylvania Street in an attempt to resolve the argument. Woodard and the others were still playing their dice game there. Woodard came to the door, where he and Tolliver, who were both angry, exchanged loud words on the porch, and also on the street in front of the house. Bailey, who accompanied Woodard and Tolliver to the street, tried to dissuade them from arguing. The three were joined by Henry, who remained on the

---

**1.** Ind.Code § 35–42–1–1 (2008).

**2.** Ind.Code § 35–50–2–8 (2008).

sidewalk near the house and did not enter the street. At some point, Bailey heard Tolliver, who was standing behind him, fire gunshots. Henry similarly saw Tolliver fire his gun multiple times in rapid succession. According to both Bailey and Henry, Woodard, who had been standing approximately five feet from Tolliver, took off running. Shortly thereafter, Smith asked Tolliver for his gun and threw it into the yard. Tolliver retrieved the gun and took off running in the opposite direction.

At approximately 9:00 or 9:30 p.m. the evening of September 15, 2008, Gary Police Officer John Artibey was dispatched to a Citgo gas station at the corner of 15th and Broadway Streets in Gary to render assistance to Woodard, who was suffering from gunshot wounds. Upon arriving Officer Artibey found Woodard holding his bleeding side with his hand. According to Officer Artibey, Woodard was nervous and uncooperative and asked for medical attention. Medical personnel arrived within three to five minutes and transported Woodard to the hospital. Officer Artibey followed.

Upon arriving at the hospital, by which point Woodard had calmed down somewhat, Officer Artibey spoke to Woodard and was able to ascertain that the location of the shooting was in the vicinity of 1300 Pennsylvania Street. According to Officer Artibey, Woodard was "very uncooperative" and his demeanor suggested that he was trying to hide something.

Gary Police Officer Jeffrey Hornyak was similarly dispatched to the hospital. Officer Hornyak questioned Woodard, who said that he had been shot in the area of 13th and Pennsylvania Streets and that he did not know who had shot him. Woodard did indicate that he had seen the shooter before, but declined to identify him on the grounds that he was "not a snitch" and would "take care of it [him]self in the street." Tr. p. 233. According to Officer Hornyak, Woodard, who was lying on a stretcher at the time, rolled away from Officer Hornyak as he spoke. It was Officer Hornyak's view that Woodard was "uncooperative" and "didn't want to have anything to do with speaking" to him. Tr. p. 242.

Woodard's mother, Dessie Lewis, his father, Benjamin Woodard, Sr., his sister, Shawntia Woodard, and his girlfriend, La-Toya Mask, went to the hospital upon hearing Woodard had been shot. According to Lewis, Woodard told her that he had been shot by Tolliver and that Woodard was therefore "going to get" Tolliver. Tr. p. 116. Woodard similarly told his father, Benjamin Woodard, Sr., that Tolliver had shot him. According to Shawntia, Woodard told her that he was not going to tell who had shot him, but that when she said Mask had told her Tolliver had shot him, Woodard confirmed that Tolliver had shot him and stated the following: "[M]an, why did she tell you that? Did you tell the police?" Tr. p. 474. Woodard also stated, "[W]hy are you telling the police? I ain't no snitch.... I will handle it myself." Tr. pp. 478.

Several hours after arriving at the hospital, Woodard died as a result of two gunshot wounds, one to the back and the other to the abdomen. The entry point for these wounds was in Woodard's right back and right buttock areas.

Lake County Police Department Captain and firearms examiner Kevin Judge concluded that the bullets found inside Woodard's body were consistent with automatic ammunition from a .32 caliber handgun. Authorities checked the 1300 block of Pennsylvania Street but found no spent casings.

In Tolliver's defense, Michael Tolliver and Montrell Jolly contended that Tolliver

was at Michael's house on the evening in question changing the rims on Michael's tires. Tolliver's girlfriend, Alexis Harris, similarly contended that Tolliver was at her house in the afternoon and early evening of the day in question, before he left to help Michael and Jolly with their car.

## II. Proceedings

On September 19, 2008, the State charged Tolliver with murder. On October 20, 2008, the State amended its information by alleging Tolliver to be a habitual offender on the basis of his claimed March 2002 conviction for Class D felony Auto Theft and his claimed September 2006 conviction for Class D felony Intimidation.

Prior to trial, the State filed motions in limine seeking to exclude any reference by defense counsel to witness Henry's arrests and witness Bailey's convictions and arrests. Defense counsel objected on the grounds that the defendant was entitled to inquire into these witnesses' potential motivations for testifying, especially given both witnesses' July 21, 2008 arrests and the possibility of an accompanying deal for testifying. The trial court granted the State's motions on the grounds that there was no indication that charges against either witness were being withheld pursuant to a deal for testifying.

Also prior to trial, the State sought the court's permission to introduce into evidence Woodard's statements to his father, mother, and sister identifying Tolliver as the shooter. On January 28, 2009, the trial court concluded that the statements were admissible as statements against interest pursuant to Indiana Evidence Rule 804(b)(3) because they were accompanied by Woodard's statement that he would "take care of it." At trial, defense counsel did not lodge a contemporaneous objection to Woodard's mother's or father's testimony regarding Woodard's statements to them, but defense counsel did re-object to his sister Shawntia's testimony on this point and asked that the objection apply to all of Woodard's statements of identification already introduced.

Also at trial, Officer Hornyak testified as a skilled witness that, based upon Woodard's body language, Woodard appeared to be uncooperative and "closed up." Tr. p. 242. Defense counsel objected to this testimony on the grounds that Officer Hornyak's testimony was an impermissible opinion regarding Woodard's truthfulness.

During trial and after the presentation of the State's case, defense counsel sought a continuance when he was unable to locate defense witness Smith. The trial court denied the continuance on the basis that efforts at locating Smith had been unsuccessful for a period of time, and there was little promise that he would be found if the court were to grant the continuance.

Following trial, the jury found Tolliver guilty of murder, and in a second phase, found him to be a habitual offender. Prior to sentencing, defense counsel moved for a new trial on the grounds that, *inter alia,* Smith had been found and placed into custody. The defense claimed that Smith's testimony constituted newly discovered evidence warranting a new trial. The trial court denied Tolliver's motion. At the March 17, 2009 sentencing hearing, the trial court sentenced Tolliver to sixty years for his murder conviction, enhanced by thirty years due to his habitual offender status, for a total sentence of ninety years in the Department of Correction. This appeal follows.

## DISCUSSION AND DECISION[3]

### I. Body Language Testimony

We first address Tolliver's claim that the trial court abused its discretion in permitting Officer Hornyak to testify as a skilled witness regarding Woodard's body language at the time he made certain statements. Appellant's Br. p. 14.

### A. Standard of Review and Applicable Law

■ Generally, a trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *Combs v. State,* 895 N.E.2d 1252, 1255 (Ind.Ct.App.2008) (citing *McHenry v. State,* 820 N.E.2d 124, 128 (Ind.2005)), *trans. denied.* We will reverse only where the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id.* (citing *Joyner v. State,* 678 N.E.2d 386, 390 (Ind. 1997)). Even if the decision was an abuse of discretion, we will not reverse if the admission of evidence constituted harmless error. *Id.* Error is harmless if "the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Cook v. State,* 734 N.E.2d 563, 569 (Ind.2000).

■ Although a witness may not be qualified to offer expert testimony under Indiana Evidence Rule 702, the witness may be qualified as a "skilled witness." *Kubsch v. State,* 784 N.E.2d 905, 922 (Ind. 2003). A skilled witness is a person with " 'a degree of knowledge short of that sufficient to be declared an expert under Rule 702, but somewhat beyond that possessed by the ordinary jurors.' " *Id.* (quoting 13 Robert Lowell Miller, Jr., *Indiana Evidence* § 701.105, at 318 (2d ed.1995)).

Even if a witness is not an expert or skilled witness, however, under Indiana Evidence Rule 701, any lay witness may provide an opinion or inference that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *See* Ind. Evid. R. 701. Indiana Evidence Rule 704(b) nevertheless provides as follows: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

### B. Applicable Facts

During trial the prosecutor asked Officer Hornyak about "mannerisms or behaviors" that he observed in Woodard at the hospital. Following defense counsel's objection, the prosecutor attempted to qualify Officer Hornyak as a skilled witness who, based upon his training in the "Reed Technique" of interrogation, was able to interpret Woodard's body language for the jury. In permitting Officer Hornyak to testify as a skilled witness, the trial court stated the following:

> This witness is uniquely qualified beyond the skills of ordinary people, to determine and interview a person and read body language and words spoken, and he's in a much better position to make a determination of whether the truth is being told than the average person. Therefore State, you have laid the foundation.

Tr. p. 238. The trial court nevertheless admonished the jury that Officer Hornyak's testimony was entitled to no greater weight and that his credibility was to be

---

**3.** We heard oral argument in this case at Pike High School. We wish to thank counsel for the quality of their arguments and the faculty, students, and staff of Pike High School and the Pike Performing Arts Center for their fine hospitality.

judged "just like every other witness in the trial." Tr. p. 239.

Although the trial court indicated that the purpose of Officer Hornyak's body language interpretation was to indicate Woodard's truthfulness or lack thereof, Officer Hornyak did not make a direct statement regarding Woodard's truthfulness. Instead, Officer Hornyak testified that Woodard, while lying on the stretcher, had rolled away from him, that Woodard became angry and said he was not a "snitch" and would "handle it himself," and that Woodard was "kind of closed up," and uncooperative and did not want to have anything to do with speaking to Officer Hornyak. Tr. pp. 239, 242.

### C. Analysis

■ As the State acknowledges, other courts have disapproved of "body language testimony," which portrays the testifying officer as a "human lie detector." *See U.S. v. Williams*, 133 F.3d 1048, 1052–53 (7th Cir.1998); *People v. Henderson*, 394 Ill. App.3d 747, 333 Ill.Dec. 667, 915 N.E.2d 473, 477–79 (2009). We are similarly skeptical of body language testimony and join those courts in expressing our disapproval of such evidence. We must therefore conclude that the trial court's finding Officer Hornyak to be a "skilled witness" who was somehow "uniquely qualified" to assess Woodard's truthfulness was error.

■ While this error placed the entirety of Officer Hornyak's testimony regarding the subject matter of Woodard's behavior in peril, we must observe, as the State points out, that Officer Hornyak did *not* testify regarding Woodard's specific truthfulness. Rather, he merely observed, as any lay witness might have observed, that Woodard was "uncooperative" based upon the simple facts that Woodard rolled away from him, became angry with him, and did not wish to speak to him. Such a common-sense conclusion did not require a "skilled

witness" foundation and would have been admissible pursuant to Rule 701 as a lay opinion rationally based upon perception and helpful to a clear understanding of the facts of the case. In addition, in spite of the trial court's preliminary endorsement of Officer Hornyak's truth-finding skills, it later cured this endorsement by admonishing the jury, before Officer Hornyak testified, that his testimony was instead entitled to no greater weight, and that his credibility was to be judged on the same level as every other witness's.

Error is harmless if the conviction is supported by substantial independent evidence of guilt such that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Cook*, 734 N.E.2d at 569. Here, while there was clear error in the trial court's endorsement of Officer Hornyak's truth-finding skills, the trial court immediately cured this endorsement with a subsequent instruction. Perhaps more importantly, Officer Hornyak's testimony, however improperly set up, ultimately constituted lay observations admissible under Rule 701. In addition, regardless of the admissibility of Officer Hornyak's testimony, two independent eyewitnesses—Bailey and Henry—whose testimony was wholly unrelated to and unaffected by Officer Hornyak's testimony or Woodard's truthfulness, identified Tolliver as the shooter, and Henry connected Tolliver to a gun like the one used to kill Woodard. We must therefore conclude that the trial court's errors relating to body language testimony constituted harmless error.

### II. Statements Against Interest Pursuant to Indiana Evidence Rule 804(b)(3)

Tolliver next challenges the trial court's admitting, as Indiana Evidence Rule 804(b)(3) statements against interest, testimony by Lewis, Benjamin Woodard, Sr.,

and Shawntia (Woodard's mother, father, and sister) that Woodard identified Tolliver as the shooter.

## A. Standard of Review and Applicable Law

The standard of review for the admissibility of evidence is listed under Issue I, above.

Indiana Evidence Rule 804(b)(3) provides as follows:

> *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused, is not within this exception.

Statements against interest are admissible if, at the time they were made, they tended to subject the declarant to criminal liability such that a reasonable person in the declarant's position would not have made them if he did not believe in their truth. *See* Ind. Evid. R. 804(b)(3). The State concedes that, as a general matter, to qualify under this hearsay exception, the statement against interest must be incriminating on its face. *See Jervis v. State*, 679 N.E.2d 875, 878 (Ind.1997).

## B. Applicable Facts

Prior to trial, the State sought to introduce Woodard's statements identifying Tolliver as the shooter. Defense counsel objected, but the trial court ruled that these statements were admissible. The trial court concluded that Woodard's identification statements qualified as Indiana Evidence Rule 804(b)(3) statements against interest on the basis that they were accompanied by Woodard's suggestion that he would, in the trial court's view, "take care of it." App. p. 34. The trial court observed that Woodard's "take care of it" statements "impl[ied]" that he would act out in violence, either committing a battery or worse." App. p. 34.

At trial, Lewis testified that Woodard had identified Tolliver as the shooter and had made an accompanying statement that he was "going to get" Tolliver. Tr. p. 116. Shawntia also testified that Woodard had identified Tolliver as his shooter and had made the accompanying statement that he would "handle it [him]self" Tr. pp. 478. Benjamin Woodard, Sr. testified that Woodard had identified Tolliver as the shooter. Benjamin Woodard Sr. did not indicate that Woodard had made any accompanying statement.

Defense counsel did not lodge an objection prior to or during Lewis's or Benjamin Woodard Sr.'s testimony regarding Woodard's statements of identification. Defense counsel did lodge a contemporaneous objection to Shawntia's testimony and indicated his wish that this objection operate to cover all prior statements of identification by Woodard.

## C. Analysis

As a preliminary matter, it is noteworthy that defense counsel did not lodge a contemporaneous objection to Lewis's and Benjamin Woodard, Sr.'s testimony at the time they were made. To preserve an issue for appeal, a party must make a contemporaneous objection at trial. *Staley v. State*, 895 N.E.2d 1245, 1248 (Ind.Ct. App.2008), *trans. denied.*

On the merits, the trial court abused its discretion by admitting this tes-

timony into evidence as an admission against interest. As the State concedes, Woodard's statements that he would "get" Tolliver and "handle it [him]self" are not incriminating on their face and do not implicate him in a crime. These statements are merely statements of intent. To the extent they are claimed to evince criminal intent, *mens rea*, in and of itself, does not subject a person to criminal liability. *See Smith v. State*, 718 N.E.2d 794, 804 (Ind. Ct.App.1999), *abrogated on other grounds by Fajardo v. State*, 859 N.E.2d 1201 (Ind. 2007) (concluding that statements by an individual that he did not like certain children and wished to kill them were merely evidence of his motive to harm and could not be interpreted, for Rule 804(b)(3) admissibility purposes, as subjecting him to criminal liability).

Furthermore, to the extent these statements can be construed as incriminating or otherwise against Woodard's interest, they merely *accompanied* the disputed identification statements. Under the plain language of Rule 804(b)(3), the identification statements themselves must have been against Woodard's interest in order to be admissible. Significantly, in Benjamin Woodard Sr.'s case, the accompanying "statement against interest" which apparently permitted Benjamin Woodard Sr. to testify about Woodard's identification was never even mentioned during his testimony.

■ The State argues that any error in the admission of these statements was harmless. In evaluating the impact of this inadmissible testimony, we must observe that only Shawntia's testimony was properly preserved for appellate review. Her testimony was merely cumulative of Lewis's and Benjamin Woodard Sr.'s testimony, which—admissible or not—had already been admitted, without objection, at trial.

■ Of course, regardless of waiver, fundamental error occurs when the record reveals a clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and which violation is so prejudicial to the rights of the defendant as to make a fair trial impossible. *See Jewell v. State*, 887 N.E.2d 939, 942 (Ind.2008). Given the independent eyewitness testimony of both Henry and Bailey identifying Tolliver as the shooter and Henry's testimony linking Tolliver to the type of gun used to kill Woodard, we cannot conclude that the erroneous introduction of Lewis's, Benjamin Woodard, Sr.'s and Shawntia's testimony, even in conjunction with the "body language" errors, was so prejudicial to Tolliver's rights that a fair trial was impossible.

### III. Denial of Continuance

Tolliver's third challenge is to the trial court's denial of his motion for a continuance so that he could locate defense witness Jontae Smith.

### A. Standard of Review and Applicable Law

■ Rulings on non-statutory[4] motions for continuance lie within the discretion of the trial court and will be reversed only for an abuse of that discretion and resultant prejudice. *Barber v. State*, 911 N.E.2d 641, 645–46 (Ind.Ct.App.2009) (citing *Maxey v. State*, 730 N.E.2d 158, 160 (Ind.2000)). An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* at 646 (citing *Maxey*, 730 N.E.2d at 160).

---

4. Indiana Code section 35–36–7–1(2008) provides for motions by defendants to postpone a trial due to, *inter alia,* the absence of a witness. Tolliver does not claim that section 35–36–7–1 is applicable to his motion for a break in the trial proceedings.

 Every defendant has the fundamental right to present witnesses in his or her own defense. *Id.* (citing *Roach v. State*, 695 N.E.2d 934, 939 (Ind.1998) (some internal citations omitted); *see Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). "This right 'is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecutor's to the jury so it may decide where the truth lies.'" *Barber*, 911 N.E.2d at 646 (quoting *Roach*, 695 N.E.2d at 939) (internal quotation omitted)). "'At the same time, while the right to present witnesses is of the utmost importance, it is not absolute.'" *Id.* (quoting *Roach*, 695 N.E.2d at 939 (internal citation omitted)). "'In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Id.* (quoting *Roach*, 695 N.E.2d at 939 (internal quotation omitted)).

## B. Applicable Facts

On February 3, 2009, which was apparently the second day of trial,[5] defense counsel indicated that he had subpoenaed and spoken to Smith but that Smith had failed to appear for trial, and that he was having difficulty locating him. According to defense counsel, Smith, who had outstanding warrants, had three different addresses. Defense counsel requested the court to issue a Writ of Body Attachment

for the Lake County Sheriff to locate Smith and bring him to court. The State indicated that the Gary Police Department had been actively looking for Smith, as had the State for purposes of the instant case, and did not object to defense counsel's request. The trial court granted defense counsel's request to issue a Writ of Body Attachment.

On February 4, the date for the defense to present its case, defense counsel requested a continuance in the event that Smith did not appear by the close of the defense's case.[6] As an offer of proof, defense counsel explained that he had heard from a person who identified himself as Smith the Friday prior to the Monday start of trial. According to defense counsel, Smith would testify that he, Henry, and Bailey were together inside a building at the site of the shooting; that upon hearing gunshots, they ran outside and saw the victim, but no assailant, run away; and that shortly before the shooting, he was on the phone with Tolliver, and that Tolliver was at some other undisclosed location.

After the defense presented its witnesses that day, it sought to call Smith. Smith was not present, so defense counsel repeated his request for a continuance. According to defense counsel, police, defense counsel's investigator, and defense counsel were unsuccessful in their attempts to locate Smith at three potential addresses. In objecting to a continuance, the State emphasized that there was no guarantee, and perhaps little possibility,

---

**5.** The record does not contain a complete CCS, and the transcript does not provide a date for the commencement of trial.

**6.** Apparently, the defense was first made aware of Smith in an October 20, 2008 discovery filing by the State. Since that date,

defense counsel indicated that his investigator had gone to Smith's only known address multiple times, to no avail, which is where Smith was served a subpoena to appear for the first day of trial.

that a continuance would result in Smith's apprehension and appearance.

The State's argument on this point was buttressed by statements from Officer Jackson of the Gary Police Department. Officer Jackson indicated that Smith was wanted on three active warrants, as well as in connection with two murder cases, that Smith knew authorities were trying to locate him, and that the Gary Police Department had been actively looking for him. Officer Jackson did not believe that Smith would appear.

The trial court subsequently denied Tolliver's motion for a continuance on the following grounds:

> Certainly, the defense's request to continue this matter until tomorrow is certainly not unreasonable by any stretch of the imagination. The stake in this case for the defendant, Theotis Tolliver, is very large. He's looking at 45 to 65 years in the Department of Corrections, if convicted. The fact that it is now 2:33 in the afternoon and there is ample time to finish this case today is of very little consequence in this Court's mind. The fact that continuing this one day and having to pay fourteen jurors another day's wage is of very little consequence in this Court's mind because of the potential penalties for Mr. Tolliver if, in fact, he's convicted. But at the same time, while the Court is not second-guessing what [defense counsel] has indicated to the Court, that Jontae Smith indicated to him just the Friday before trial, it is also clear that Mr. Smith will not make himself available or come anywhere near police officers or the court system, knowing that he has three active warrants for failing to appear and quite possibly—and I say "possibly" knowing that he may be investigated on another homicide. So this Court specifically finds that giving the defense an additional night or day to try to find Mr. Jontae Smith is not an unreasonable request, but at the same time, it is also, if granted, not likely to produce the intended results that the defense wishes. Therefore, the motion to continue the matter is denied.

Tr. pp. 673–74.

### C. Analysis

■ In claiming that the trial court abused its discretion by denying his request for a continuance, Tolliver points to this court's recent decision in *Barber*, where the trial court was found to have abused its discretion for refusing to grant the defendant a continuance the day of trial to permit her to secure witness testimony. 911 N.E.2d at 642–43. In *Barber*, the trial court denied the defendant a continuance because her request for it fell well past the court's hard deadline for the witness list. *Id.* at 646. The defendant in *Barber* was charged with operating a vehicle while intoxicated and sought to present a defense of involuntary intoxication based upon her alleged belief that someone had slipped something into her drink. *Id.* at 642, 645. The defendant, whose trial was held a mere two months after her arrest, sought her first continuance before defense counsel was appointed. *Id.* at 646–47. She sought and received a second continuance approximately a month later following a motion by defense counsel indicating that there were perhaps several additional witnesses to be identified. *Id.* at 646. Thereafter, the trial court set a trial date. *Id.* at 647. Two days before the trial started, defense counsel located two important witnesses to the defendant's defense. *Id.* One of these witnesses believed she had similarly been drugged at the same site on the evening in question. *Id.* The other witness would have supported the defendant's and this witness's claims. *Id.* In order to secure the testimo-

ny of these witnesses at trial, the defendant requested a third continuance. *Id.* at 644. The only prejudice the State alleged this requested continuance would cause was the inconvenience to two of its witnesses for showing up that day for trial. *Id.* at 647. Even so, the trial court denied the continuance given the existence of a hard deadline for the witness list, which the trial court was unwilling to extend. *Id.* at 645.

In reversing, this court emphasized the strong presumption in favor of allowing testimony of even late-disclosed witnesses. *See S.T. v. State,* 764 N.E.2d 632, 636 (Ind.2002) ("[I]n light of a defendant's right to compulsory process under the federal and state constitutions, there is a strong presumption in favor of allowing the testimony of even late-disclosed witnesses.") This court further based its reversal upon the relatively minimal prejudice to the State, and the clear resulting prejudice to the defendant, namely her inability to bolster her defense with corroborating testimony by disinterested and detached witnesses. *Id.* at 647.

This case is fully distinguishable from *Barber.* Here, the witness at issue had a demonstrated history of elusive behavior, and the record demonstrated a low probability that any renewed efforts to find him pursuant to a continuance were somehow more promising than the other months-long efforts—by both police and civilians—had been. Indeed, the continuance requested in Barber was for purposes of arranging an available time for newly-discovered—and from all appearances cooperative—witnesses to appear, whereas the continuance requested here was for purposes of *locating* a long-missing, uncooperative witness who likely knew the high probability of immediate arrest upon cooperating with requests to appear. In addition, the prejudice to the State was poten-

tially greater in this mid-trial request for a continuance than it was in the pre-trial request at issue in *Barber:* as the State argued, it had not yet deposed Smith and was therefore unprepared to present a rebuttal to his potential testimony. Although defense counsel indicated he had no objection to the State's deposing Smith, this would cause an even greater delay in the trial proceedings, placing the State at risk of losing any favorable momentum it may have gained during the presentation of its case. Further still, the risk of prejudice to Tolliver of denying the continuance was less pronounced here than it was in *Barber:* Smith's testimony only promised to counter the testimony of Bailey and Henry, both of whom had implicated Tolliver in the crime. And unlike in *Barber,* denying the continuance did not leave Tolliver without witnesses on his behalf; both Michael and Jolly testified in Tolliver's defense as alibi witnesses. Given the arguable unlikelihood of finding Smith, the potential for prejudice to the State, and the jury's ability to consider Tolliver's alibi defense as presented by other witnesses, we are unpersuaded by Tolliver's claim based on *Barber* that the trial court's refusal to grant a continuance constituted an abuse of discretion. *See Walker v. State,* 471 N.E.2d 1089, 1092 (Ind.1984) (finding no abuse of discretion in trial court's denial of continuance when likelihood of locating witness was remote, witness testimony was merely corroborative and the jury could still consider the defendant's own explanation of the events in question, and effect of delay on State's young witnesses would be prejudicial).

## IV. Cross–Examination of Witnesses Regarding Potential Bias

Tolliver's final challenge is to the trial court's prohibiting defense counsel from inquiring into Henry's and Bailey's possi-

ble bias or ulterior motives on cross-examination.

## A. Standard of Review and Applicable Law

 For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible. Ind. Evid. R. 616. The trial court has wide discretion to determine the scope of cross-examination, and only an abuse of that discretion warrants reversal. *McCorker v. State*, 797 N.E.2d 257, 266 (Ind.2003)).

 On the other hand, the Sixth Amendment of the United States Constitution guarantees a defendant the right to confront witnesses against him. *Id.* This right is secured for defendants in state criminal proceedings through the Fourteenth Amendment. *Id.* The Indiana Supreme Court has previously determined that any beneficial agreement between an accomplice and the State must be revealed to the jury. *Id.* " 'This rule serves to help the jury better assess the reliability and honesty of the felon-witness.' " *Id.* (quoting *Morrison v. State*, 686 N.E.2d 817, 819 (Ind.1997)). The full extent of the benefit offered to a witness is relevant to the jury's determination of the weight and credibility of the witness's testimony. *Id.*

 While confirmed promises for leniency must be revealed, whether in writing or not, preliminary discussions are not matters subject to such mandatory disclosure. *See Seketa v, State*, 817 N.E.2d 690, 694 (Ind.Ct.App.2004). An express agreement requiring disclosure does not exist if a witness testifies favorably in the hope of leniency, and the State neither confirms nor denies leniency to the witness. *Id.; see Wright v. State*, 690 N.E.2d 1098, 1113 (Ind.1997). Similarly, hopes and expectations of a state witness coupled with evidence of a prosecutor-witness deal occurring after the testimony are not subject to mandatory disclosure. *See Wright*, 690 N.E.2d at 1113.

## B. Applicable Facts

Prior to trial, the State filed a motion in limine seeking to exclude any reference by defense counsel to witness Henry's arrests and witness Bailey's convictions and arrests. Defense counsel objected on the grounds that the defendant was entitled to inquire into these witnesses' potential motivations for testifying, especially given both witnesses' recent arrests and the possibility of an accompanying deal for testifying.

Although no police report was provided, it appears from the record that on July 21, 2008, Henry and Bailey were found inside a vehicle with another individual, who was possessing narcotics at the time. The parties were arrested by the Gary Police Department and held for forty-eight hours,[7] but no charges were filed against Henry and Bailey. One to two months later, Henry and Bailey were main witnesses in the instant case, which defense counsel suggested was somewhat "miraculous" and perhaps attributable to the State's agreement not to file charges in the July case. Tr. p. 31. Defense counsel conceded that he had not deposed police officers regarding any potential deals with Henry and Bailey, and that both Henry and Bailey denied during their own depositions that any such agreements or leniency deals existed.

---

7. The State suggested that the forty-eight-hour hold was perhaps for drug testing purposes.

The trial court granted the State's motion in limine upon finding there to be no evidence or "indication whatsoever" that charges were being withheld or used in consideration for testimony in the instant trial. Tr. p. 37.

### C. Analysis

 Tolliver bases his argument upon *McIntyre v. State*, 460 N.E.2d 162, 166 (Ind.Ct.App.1984), and *McCarthy v. State*, 749 N.E.2d 528 (Ind.2001). In *McIntyre*, the witness testified only after being threatened with incarceration for contempt, which defense counsel was barred from asking about during cross-examination. 460 N.E.2d at 165. In *McCarthy*, defense counsel in a criminal case was prevented from cross-examining the witness, who had filed a separate civil action, about her potential financial interest in the outcome of the case. 749 N.E.2d at 533.

Notably, in each of the *McIntyre* and *McCarthy* cases, the basis for the alleged bias—an identifiable threat and a separate lawsuit—was not purely speculative. Here, in contrast, the "deals" about which defense counsel wished to cross-examine Henry and Bailey were totally unsupported by any evidence. Indeed, all of the evidence, including depositions, indicated that no such deals existed. Further, while "pending charges that are the basis of an arrangement with the witness are a proper subject of cross-examination," *see Smith v. State*, 721 N.E.2d 213, 219 (Ind.1999), here there was no evidence of either pending charges or an arrangement. Counsel's wish to inquire into such "deals" and "charges" was essentially a fishing expedition with no grounding in fact. Given the speculative nature of the basis for the alleged bias, Tolliver's challenge to the trial court's limitation of his defense counsel's cross-examination is without merit. *See Seketa*, 817 N.E.2d at 694.

### Conclusion

Having concluded that errors relating to body language testimony were harmless, that admission into evidence of certain alleged statements against interest did not constitute fundamental error, and that the trial court did not abuse its discretion in denying Tolliver's motion for a continuance and in prohibiting defense counsel's speculative cross-examination into witness bias, we affirm Tolliver's conviction for murder and the finding that he is a habitual offender.

The judgment of the trial court is affirmed.

DARDEN, J., and BROWN, J., concur.