**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 11 2012, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW ANGLEMEYER**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARCUS WASHINGTON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1105-CR-429 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert R. Altice, Judge
Cause No. 49G02-1007-MR-52616

**April 11, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Marcus Washington was convicted of murder,[1] a felony, and carrying a handgun without a license,[2] a Class A misdemeanor. He appeals and raises three issues that we restate as:

I. Whether the exclusion of certain defense evidence pursuant to the trial court's order granting the State's pretrial motion in limine resulted in fundamental error where Washington did not offer or seek to admit it during trial;

II. Whether the trial court abused its discretion when it denied Washington's request to adjourn the trial and assist Washington with enforcing a subpoena for a defense witness who refused to appear for trial, stated that he intended not to provide any testimony, and whose whereabouts were not known; and

III. Whether the trial court abused its discretion when it excluded as hearsay an absent witness's statement to police.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

On July 2, 2010, Regina Covington permitted Frederick Shaw ("Shaw"), a close friend and ultimately the victim in this case, to use her rented Dodge Charger automobile. At approximately 1:30 a.m. on July 3, Ajia Williams ("Williams") called Shaw, who was her boyfriend, and asked him to pick her up from her brother's house. About twenty minutes later, Shaw arrived in the black Charger to pick up Williams. She rode in the front passenger seat and two other male passengers, Kilo and P-Dog, rode in the back seat. After picking up Williams, Shaw immediately drove to 4303 Guilford, in Indianapolis.

---

[1] *See* Ind. Code § 35-42-1-1.

[2] *See* Ind. Code § 35-47-2-1.

2

Shaw immediately parked the vehicle in the driveway and exited the car, leaving the lights on and the engine running. Shaw began verbally arguing with a man, who was later identified as Washington, outside the house. Kari Washington ("Kari"), who is not related to the defendant, lived at the home, and she heard Washington and Shaw, both of whom she knew, arguing. Kari exited her house and attempted to break up the argument between Washington and Shaw, who were facing each other near her front porch. However, as she approached, Shaw threw a punch at Washington and accidently hit Kari, who fell to the ground. At that point, a gun was fired. Upon hearing the shot, Williams, still in the Charger, observed Washington holding a gun and pointing it at Shaw. Williams ran up to Washington and pulled his shirt, and he said, "Bitch, get off of me." *Tr.* at 64, 94. Kari ran inside her house. Shaw fled the scene, and Williams did not see where he went. At some point, Kilo and P-Dog exited the Charger because, after the shot was fired, and people scattered, Washington got into the Charger and drove away alone.

Williams and others searched the area for Shaw but did not find him. Eventually, Williams called the police. An officer responded to the anonymous "shots fired" call; however, he did not search for a victim because he did not know that anyone was shot. Later, around 6:00 a.m., police were called again to the scene after Shaw's cousins had located his body across the street and behind or beside a house. Williams was at the scene and police took a statement from her. The autopsy investigation revealed that Shaw died from a single gunshot wound to the chest that was fired from a short distance away, three feet or more. The police also recovered the Charger a couple of blocks away.

On July 4, 2010, Kari told Indianapolis Police Department Homicide Detective Bill Rogers ("Detective Rogers") that the name of the man that had been arguing with Shaw in front of her home was Marcus Washington, and Kari identified Washington from a photo array. Kari did not see anyone with a gun at the scene. The next day, July 5, 2010, Detective Rogers showed that same photo array to Williams, who identified Washington as being the shooter. *Id.* at 280. Kari and Williams did not know each other.

The State charged Washington with murder, a felony, and carrying a handgun without a license, a Class A misdemeanor. On the day of trial, the State filed a motion in limine. Relevant to this appeal is paragraph eight, which sought to prohibit the defense from presenting any evidence that, shortly after the shooting, members of Shaw's family had come to Kari's home and threatened to kill her and everyone in the house. The trial court granted paragraph eight over Washington's objection.

On the afternoon of the second and final day of trial, Washington raised the matter of a defense witness, Eddie Kinnel, who had refused to appear for trial, even after being subpoenaed. Washington's counsel requested trial court assistance with bringing Kinnel to court, but conceded that they did not know Kinnel's current location or his place of employment. Counsel further shared that Kinnel had said if he was brought to court he would say that he did not know anything. The trial court determined that there was no realistic timely means of obtaining the witness at that point in trial and proceeded with the trial. Later, during the testimony of Detective Rogers, Washington attempted to introduce Kinnel's taped statement to police, but the State objected on hearsay grounds, which the trial

4

court sustained. *Id*. at 302-05. The jury found Washington guilty as charged. He now appeals.

## DISCUSSION AND DECISION

### I. Evidence of Threats

At the start of trial, the State filed a motion in limine seeking to exclude, among other things, the following evidence from trial on the basis that it was not relevant and any probative value was outweighed by unfair prejudice:

> [T]he defense attorney should be prohibited from asking about, and the defendant and his witness(es) should refrain from commenting upon the alleged threats that Kari Washington received from the victim's family after this incident occurred.

*Appellant's App*. at 89; *Tr*. at 14-15. After receiving argument from counsel, the trial court granted the State's motion in limine, over Washington's objection. However, the trial court further stated that, at the appropriate time during trial, defense counsel could approach the bench and a final ruling would be made at that time with regard to the admissibility of the evidence. *Tr*. at 15.

Rulings on motions in limine are not final decisions and, therefore, do not preserve errors for appeal. *Barnett v. State*, 916 N.E.2d 280, 287 (Ind. Ct. App. 2009) (offer of proof required to preserve error in exclusion of witness testimony), *trans. denied* (2010); *Simmons v. State*, 760 N.E.2d 1154, 1158 (Ind. Ct. App. 2002). Although motions in limine serve to protect against prejudicial evidence being placed before the jury, the ultimate determination of the admissibility of the evidence is made by the trial court in the context of the trial. *Earlywine v. State,* 847 N.E.2d 1011, 1013 (Ind. Ct. App. 2006). By requiring that an

5

objection be made during the trial at the time when the testimony is offered into evidence, the trial court is able to consider the evidence in the context in which it is being offered and is able to make a final determination on admissibility. *Id.*

In this case, Washington failed to request relief during trial from the trial court's prior ruling on the motion in limine or otherwise seek to present any evidence concerning the alleged threat(s). *Appellant's Br*. at 8. Our Supreme Court has recognized that "[a]bsent either a ruling admitting evidence accompanied by a timely objection or a ruling excluding evidence accompanied by a proper offer of proof, there is no basis for a claim of error." *Hollowell v. State,* 753 N.E.2d 612, 615–16 (Ind. 2001). Candidly recognizing the absence of an offer of proof, Washington urges that if we find he failed to preserve the issue, which he characterizes as an improper exclusion of evidence, "it must be analyzed under the doctrine of fundamental error." *Appellant's Br*. at 8. However, his argument is misguided. First, contrary to his characterization, this issue is not one of improper exclusion of evidence; the trial court only ruled on a pretrial motion in limine. Second, by its very nature, a trial court's ruling on a motion in limine cannot constitute fundamental error. An order in limine has no conclusive effect and cannot deny a defendant a fair trial. It is preliminary only. The final determination on the admissibility of the evidence is made during the trial in response to a party's motion for relief from the order in limine and evidentiary proffer. *Earlywine*, 847 N.E.2d at 1013. By failing to make such a motion or proffer at trial upon which the trial court could rule, there simply is no trial court ruling before us to review. Washington's

6

failure to preserve error cannot constitute fundamental error. Otherwise, a party could create fundamental error by his own inaction.

## II.     Defense Witness Who Failed to Appear

On the second day of Washington's jury trial, nearing the conclusion of the State's case in chief, counsel for Washington advised the trial court that a subpoenaed defense witness, Kinnel, refused to appear for trial. Kinnel was expected to testify that, on the night in question, he was staying at his girlfriend's home, which was adjacent to Kari's home, and he had been awakened by the sound of the gun shot that night. At some point, he looked out his window and saw a black Charger with a flat tire, with two passengers, backed into the driveway of Kari's residence.

Washington's counsel advised the trial court that he had taken action to bring Kinnel to court, including hiring a private investigator to locate Kinnel and that the investigator had been able to locate Kinnel only "just recently." *Tr*. at 291. The first occasion that Washington's counsel personally spoke to Kinnel by phone was during the current trial, and in that conversation Kinnel told counsel that he was not coming to trial and further stated, "I don't care if it's the State or the defense. If I come down there, I'm just going to say 'I know nothing.'" *Id*. at 292.

Washington's counsel asked the trial court to enforce the subpoena that had been issued to Kinnel. The trial court, frustrated that the matter was not brought to the court's attention until midway through the second and final day of trial, nevertheless indicated its willingness to issue a warrant for Kinnel, but noted that, realistically, trial would be over by

7

the time the warrant reached the Civil Sheriff branch for service and Kinnel was found. *Id.* at 291. Washington's counsel declined the offer to issue a warrant but asked the trial court to issue a "writ of assistance," where the "police department run out and pick him up." *Id.* The trial court initially indicated concern about whether it possessed the ability to do that, and ultimately denied the request for police assistance, stating "Well, the bottom line is, we are near the end of trial and you come to me now and tell me of your issues, which doesn't – there's not a whole lot I can do." *Id.* at 293. On appeal, Washington maintains that it was error for the trial court not to continue the trial or help him bring his witness to court, and consequently he was denied his Sixth Amendment right to compulsory process, including the right to subpoena witnesses and the right to present them in defense.

Washington concedes that he did not seek a continuance at trial when Kinnel failed to appear. *Appellant's Br.* at 11. Therefore, to avoid waiver, Washington must prove fundamental error. Fundamental error occurs when the record reveals a clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and which violation is so prejudicial to the rights of the defendant as to make a fair trial impossible. *Tolliver v. State,* 922 N.E.2d 1272, 1281 (Ind. Ct. App. 2010), *trans. denied.*

Every defendant has the fundamental right to present witnesses in his or her own defense. *Id* at 1282. That right is not absolute, however, and both the State and the accused must comply with established rules of procedure. *Id.* at 1283-84 (trial court did not err in denying defense's motion for continuance during trial where subpoenaed witness who failed to appear had clearly demonstrated his unwillingness to "come anywhere near police officers

8

or the court system"). In deciding its course of action when faced with a witness that fails to appear, a trial court must "evaluate and balance competing interests[.]" *Rowe v. State*, 444 N.E.2d 303, 306 (Ind. 1983) (no abuse of discretion occurred where trial court denied defense's motion to continue trial in order to secure attendance of witness that failed to appear).

Here, defense counsel knew about Kinnel as a witness at least six months before trial. However, Washington's counsel did not advise the court of the difficulty in reaching Kinnel or obtaining his presence until the trial was nearing its end. Furthermore, Kinnel had communicated his refusal to cooperate and intent to say he did not know anything, so it is speculative that his testimony would have been credible or assisted Washington in any way. As for whether the trial court could have or should have stopped trial and sent law enforcement to locate Kinnel and bring him to court, Washington's counsel conceded that he did not know where Kinnel worked, nor would Kinnel's wife disclose that information. *Tr.* at 289. Lastly, if Kinnel were brought to court, he could only have provided testimony concerning what he saw out the window after he was awakened by the gun shot; he could not have testified as to who fired the shot that killed Shaw. On the other hand, Williams and Kari each testified that she saw Washington and Shaw arguing face to face. After Kari fell to the ground, she heard the gunshot, as did Williams who was still in the Charger. Williams saw that Washington had a gun pointed at Shaw and testified that he was the only person she saw with a gun.

Washington has not demonstrated that he was denied a fair trial because of the trial court's decision not to stop trial in order to try to locate an uncooperative witness whose whereabouts were not known and who had already expressed intent not to provide honest testimony. The trial court did not commit fundamental error.

### III. Exclusion of Kinnel's Statement to Police

On direct examination, Detective Rogers testified about various aspects of his investigation of the crime. During cross-examination of Detective Rogers, Washington's counsel asked Detective Rogers whether, as part of his investigation, he had obtained a taped statement from Kinnel. The State objected to the ensuing questions, which were headed toward the substance of Kinnel's statement, on the basis of hearsay; the trial court agreed, sustaining the objection and excluding the evidence. Washington argues on appeal that the trial court erred when it excluded the evidence of Kinnel's taped statement to police.

In general, the decision to admit or exclude evidence, including purported hearsay, is within a trial court's sound discretion and is afforded great deference on appeal. *Ballard v. State*, 877 N.E.2d 860, 861-62 (Ind. Ct. App. 2007). We will not reverse the trial court's decision unless it represents an abuse of discretion that results in the denial of a fair trial. *Id.* at 862. An abuse of discretion in this context occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.*

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Ind. Evidence Rule 801(c).

10

Hearsay, generally, is inadmissible. Evid. R. 802. Statements not offered for their truthfulness are not hearsay. *Treadway v. State* 924 N.E.2d 621, 635 (Ind. 2010).

Here, Washington's counsel argued to the trial court that Kinnel's taped statements to Detective Rogers were not being sought for the truth of the matters asserted, and therefore were not hearsay. *Tr.* at 303-05. He argued that the statements were being offered to demonstrate the manner in which Detective Rogers proceeded with his investigation, in particular his investigation of Kilo and P-Dog. *Id.* The trial court received counsels' arguments at the bench and ultimately rejected Washington's claim that the statements were not being offered for their truth, stating it was not going to allow Washington to "back door" a defense into evidence. *Id.* at 305. Based on the record before us, we find no abuse of discretion in the trial court's decision to exclude Kinnel's statements as "blatant hearsay." *Id.* at 304.

Furthermore, even if it was an abuse of discretion to exclude Kinnel's statement to police, we do not find that Washington's substantial rights were affected. *See Barnett v. State*, 916 N.E.2d 280, 286 (Ind. Ct. App. 2009) (citing to Ind. Evid. Rule 103, error may not be predicated upon ruling to admit or exclude evidence unless substantial right of party is affected), *trans. denied.* If, as Washington claims, he wanted the statements in evidence not for the truth of the matters asserted, but only to "show why Rogers proceeded with his investigation into Kilo and P-Dog as he did, and possibly to impeach the thoroughness of Rogers' investigation," he has not demonstrated in what way the exclusion of that purported impeachment evidence prejudiced him or substantially affected his rights. *Appellant's Br.* at

11

13. Again, the evidence presented was that Williams observed Washington and Shaw, facing each other, arguing. Williams was looking down, but heard a gunshot, and when she looked up, she saw Washington holding a gun. She testified that he was the only person at the scene that she observed with a gun. She ran to Washington and, within feet of him, pulled his shirt. He pointed the gun at her and told her to get away from him. She later identified Washington in a photo array. On a separate date, Kari, who did not know Williams, also identified Washington from a photo array as the man who was arguing with Shaw in front of her house that night. In light of this evidence, we do not find that Washington was substantially prejudiced or denied a fair trial because the trial court excluded Kinnel's statement to police, which, according to Washington, was only meant to impeach the thoroughness of Detective Rogers's investigation.

Affirmed.

BARNES, J., and BRADFORD, J., concur.