# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 22 2017, 5:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Hilary Bowe Ricks
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Jenkins,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

February 22, 2017

Court of Appeals Case No.
49A02-1602-CR-399

Appeal from the Marion Superior Court

The Honorable Grant Hawkins, Judge

Trial Court Cause No.
49G05-1410-MR-46576

**Brown, Judge.**

[1] James Jenkins appeals his conviction for murder. Jenkins raises one issue which we revise and restate as whether the court abused its discretion in admitting certain evidence. We affirm.

## *Facts and Procedural History*

[2] In the early morning hours of October 1, 2014, Raul Castaneda-Martinez, Emmanuel Phillips, and others were gathered at a bonfire behind a house on Minnesota Street in Indianapolis. After obtaining methamphetamine, they went across the street to the home of Emmanuel's aunt, Kim Phillips. While there, Castaneda-Martinez decided to purchase more methamphetamine, and another person phoned Jenkins for that purpose.

[3] Jenkins arrived at Kim's house and sold methamphetamine to Castaneda-Martinez. Before Jenkins left, Castaneda-Martinez told Jenkins that he also was interested in purchasing cocaine. Jenkins later returned to the house, but Castaneda-Martinez informed him that he no longer wanted to buy the cocaine. Jenkins asked Castaneda-Martinez to speak outside. Emmanuel followed the two men out onto the porch, but Jenkins told Emmanuel that he wanted to speak to Castaneda-Martinez alone. Jenkins and Castaneda-Martinez then walked down the street while Emmanuel stayed outside on the front porch.

[4] A few minutes later, Emmanuel heard gunshots. Kim, who was inside, heard two gunshots that sounded like they were right in front of the house, and she quickly locked the front door and crouched on the floor. Emmanuel ran to the edge of the porch and looked in the direction that Castaneda-Martinez and

Jenkins had walked, and he saw two men run to a white SUV. In front of a house a couple of doors down, he observed Jenkins standing over the top of Castaneda-Martinez, who was on the ground. Jenkins faced Emmanuel, looked directly at him, and fired two more shots down into Castaneda-Martinez. He then ran to the white SUV and left with the other two men. Castaneda-Martinez died as a result of the gunshot wounds.

[5] Emmanuel went to Castaneda-Martinez and observed that he was not breathing. Emmanuel then returned to Kim's house. He was terrified, trembling, and kept saying that "Jay," as he knew Jenkins, had shot his friend. Transcript at 188. Emmanuel called the police tip line and told them what had happened. Later that night, Emmanuel, Kim, and another person spoke with police, told them that "Jay" shot Castaneda-Martinez, provided a physical description of Jenkins, including his distinctive face and neck tattoos, and identified Jenkins in photo arrays. *Id.* at 218.

[6] Later, Jenkins called Emmanuel and asked to meet him at a convenience store, but Emmanuel did not go because he was afraid that something would happen to him. The next time that Emmanuel saw Jenkins, Jenkins told him that he "better keep it solid and, uh, if I don't something will happen to me and my family." *Id.* at 136.

[7] Also, a few days prior to the murder of Castaneda-Martinez, someone crashed a car into a gun store and stole twenty-five handguns. Jenkins became a suspect in the burglary investigation after someone reported that he was attempting to

sell handguns stolen in the burglary. Officers conducting that investigation obtained his cell phone number and applied for a court order to determine the current location and historical locations of the phone. The affidavit detailed information to establish probable cause to believe that Jenkins was in possession of and trying to sell guns obtained in the burglary and that locating him would likely be achieved by locating the phone that was the target of the order. The affidavit was sworn to and submitted by Detective Ronald Gray of the Indianapolis Metropolitan Police Department.

[8] The court ruled that probable cause existed to believe that Jenkins had committed theft or receiving stolen property and that he could be apprehended by locating the phone "through the use of Precision Location by way of GPS technology to determine the location of the user of the **Target Phone**." Appellant's Appendix at 216. The court ordered that the service provider would give the police "GPS Precision Location for the **Target Phone** to determine the movements of the **Target Phone** for a period of thirty (30) days." *Id.* The court ordered the service provider to supply the police with subscriber identifying information, information to identify the phone, and cell site and GPS location information from September 28, 2014, to the present. The order states that, pursuant to Title 18 U.S.C. § 3124:

> the Indiana State Police shall be authorized to initiate a signal to determine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonably available, Global Position System Tracing and Tracking, Mobile Locator tools, R.T.T. (Real Time Tracking Tool), Precision Locations and any and all locations, without

geographical boundaries, and such provider shall initiate a signal to determine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent / agencies serving the Order.

*Id.* at 218.

[9] Officers from the burglary investigation assisted homicide detectives in locating Jenkins's phone during the midmorning hours of October 1, 2014, the day Castaneda-Martinez had been shot and killed. Utilizing an electronic surveillance device, police narrowed the location to a home on South State Avenue, and the police setup surveillance around the house, were provided a photograph of Jenkins, and watched for approximately an hour or more to see if they could locate him. At some point, police observed Jenkins and another man exit the house and begin walking down the street, and Jenkins nervously looked over his shoulder several times. After a detective recognized and positively identified Jenkins, officers decided to make an arrest, and after an officer activated his emergency lights Jenkins and the other man started running. Following a foot chase of approximately fifteen or twenty minutes, the police ultimately apprehended Jenkins. Police also recovered a silver and black handgun, in which subsequent testing showed that the handgun was the same gun used to kill Castaneda-Martinez, as well as Jenkins's cell phone which had been used to track him and contained a photograph of Jenkins holding a gun similar to the handgun recovered at the scene.

[10] On October 6, 2014, the State charged Jenkins with murder. On October 19, 2015, the court held a jury trial which ended in a mistrial. A second jury trial commenced on December 14, 2015. At trial, Jenkins objected to any and all evidence obtained by accessing the GPS for his cell phone, and the court overruled his objections but stated that a full hearing on the suppression claims would be held following the trial if he was convicted on the murder charge. On December 16, 2015, the jury found Jenkins guilty.

[11] On December 30, 2015, Jenkins filed a Brief of Motion to Suppress Evidence, and the State filed its response on January 12, 2016. On January 20, 2016, the court held a hearing and denied Jenkins's motion, ruling that "Whether the information provided to our Magistrate here was enough, in my view it was, but you're kind of saying, maybe he didn't understand it. And I can't rule based on what he understands. Just on what sense it makes to me and whether his actions were reasonable." Transcript at 1250.

[12] On February 5, 2016, the trial court sentenced Jenkins to sixty-three years in the Department of Correction.

### Discussion

[13] The issue is whether the court abused its discretion in admitting certain evidence. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v.*

*State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Also, "[w]hen a trial court's evidentiary ruling depends on the interpretation of a statute, case law, or a rule of evidence and not an 'application [of those] to any particular set of facts', it presents a legal question we review de novo." *Patchett v. Lee*, 60 N.E.3d 1025, 1028 (Ind. 2016). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[14] Jenkins argues that the cell tower simulator, or "Stingray," used by officers is neither a pen register nor a trap and trace device, which are devices contemplated by 18 U.S.C. § 3124. Appellant's Brief at 24. He asserts that that Ind. Code § 35-33-5-15(a)(1)(A),[1] read in conjunction with definitions provided by Ind. Code § 35-33-5-0.5, "make it clear that GPS communications from a cell phone must be considered telephonic communications that fall under Title 35, Article 33.5." *Id.* at 22. Jenkins makes a number of arguments for the proposition that the State failed to comply with Title 35, Article 33.5 of the Indiana Code.

[15] The State argues that Jenkins waived appellate review of his statutory claims because such claims are being raised for the first time on appeal, and that, waiver notwithstanding, the police complied with Ind. Code § 35-33-5-12, which governs the use of tracking devices. It maintains that Jenkins's statute-

---

[1] Ind. Code § 35-33-5-15 became effective on March 21, 2016, when it was added by Pub. L. No. 57-2016, § 3.

based arguments are "premised on assumptions about the nature of the technology employed in this case that is not supported by the record and, even if it was true, would be irrelevant to this case." Appellee's Brief at 16. The State asserts that, in the event police action did not comply with the court's order, both the good faith exception and attenuation doctrine apply, and in any event any possible error in the court's evidentiary ruling is harmless.

[16] We begin with the State's assertion of waiver. At trial, the following exchange occurred during the direct examination of Detective Gray:

> Q     Okay. And – now what – what specific action did you take to assist?

> A     Uhm, I'd contacted some other people in our unit with the Indiana State Police and asked them to assist us with electronic surveillance.

> [Defense Counsel]:     Objection. May we approach.

> THE COURT:     You may.

> *(THE FOLLOWING BENCH CONFERENCE WAS HELD AT SIDE BAR OUT OF THE HEARING OF THE JURY)*

> [Defense Counsel]:     (Indiscernible.)

> THE COURT:     (Indiscernible) about the machinery or just the (indiscernible.)

[Defense Counsel]: The fact that he's referencing the joint surveillance was through my client's (indiscernible.) I suspect that will be coming up next. I could ask him a few questions to supplement the motion if – if the Court likes.

THE COURT: Response.

[Prosecutor]: I just want to say there's nothing. There's no improper influence here.

THE COURT: This is something – this is what I said you could argue about if there's an adverse verdict.

[Defense Counsel]: Well, but I still – I still have to object at the time that the reference is taking place (indiscernible.)

THE COURT: Are you satisfied the record's been –

[Prosecutor]: He made his objection.

THE COURT: Anything else?

[Prosecutor]: I probably want to cite case law on (indiscernible) and give a specific reference of that in Article 1, Section 11 in the Indiana Constitution for (indiscernible.)

THE COURT: We're agreeing that you've made the record you need to make to preserve the issue. I think the State's agreed that the procedure I recommended which is if the verdict is adverse to you, you can have that full blown hearing prior to sentencing. . . .

Transcript at 271-273. The parties agreed to hold a motion to suppress hearing following the trial if Jenkins was found guilty.

[17] In Jenkins's Brief of Motion to Suppress Evidence, he moved the court for an order of suppression "based on the 4th and 14th Amendments to the United States Constitution and Article 1 Section 11 of the Indiana Constitution . . . ." Appellant's Appendix at 192. In support thereof, he asserted that "[t]he application for the search warrant did not include any reference to the use of cell tower simulators and the court order did not authorize such a device," noting that IMPD officers "used an electronic device ('Stingray') to search for the cellular phone with the [Target Phone number] which led to" Jenkins's location. *Id.* He asserted that a cell tower simulator such as a Stingray "simulates a cell site" which "causes or forces cell phones in an area to send their signals – with all the information contained therein – to the cell-site simulator," and that the device "captures a vast array of information, including, but not limited to, the cell phones' electronic serial number ('ESN') or international mobile subscriber identification ('IMSI')." *Id.* at 193. He argued that the "law enforcement officer failed to disclose the use of 'Stingray' in the application for the warrant effectively making it invalid," and that the good faith exception did not apply. *Id.* at 195. The State argued in its response that the court's order authorized the police activity and that "the type of device employed is irrelevant, so long as law enforcement complied with the existing law by obtaining prior judicial approval to activate its equipment." *Id.* at 206.

At no point did Jenkins mention Title 35, Article 33.5 of the Indiana Code or make any argument related to any other violations of Indiana statute.

[18] Based upon our review of Jenkins's objection and brief in support of his motion to suppress, we find that he did not raise an objection at the trial court level concerning purported violations of Indiana statute. Accordingly, we conclude that he has waived his statutory arguments on appeal. *See Moore v. State*, 669 N.E.2d 733, 742 (Ind. 1996) ("Where a defendant fails to object to the introduction of evidence, makes only a general objection, *or objects only on other grounds*, the defendant waives the suppression claim.") (emphasis added), *reh'g denied*. Moreover, we agree with the State that the record is incomplete to attempt to address Jenkins's claims on the merits.

[19] We also observe that, even if Jenkins did not waive his arguments that the use of the Stingray device violated the Indiana Code, the officers did not rely upon the court's order in good faith, and the attenuation doctrine did not apply under these circumstances, we would find that any such error was harmless. On the night of the shooting, Emmanuel Phillips, Kim Phillips, and another person spoke with police, told them that "Jay" shot Castaneda-Martinez, provided a physical description of Jenkins, including his distinctive face and neck tattoos, and identified Jenkins in photo arrays. Transcript at 218. At trial, Emmanuel testified that he and Castaneda-Martinez left a bonfire to go to Kim's home, that someone phoned Jenkins so that Castaneda-Martinez could obtain methamphetamine, that when Jenkins arrived he sold methamphetamine to Castaneda-Martinez, who indicated that he was also interested in purchasing

cocaine, and that when Jenkins returned with cocaine Castaneda-Martinez told him he was no longer interested in purchasing it. Following this exchange, Jenkins and Castaneda-Martinez left to speak outside, Emmanuel attempted to follow, but Jenkins told Emmanuel that he wanted to speak to Castaneda-Martinez alone. He testified that a few minutes later he heard gunshots, he looked in the direction that Castaneda-Martinez and Jenkins had walked, saw two men run to a white SUV and soon after observed Jenkins standing over the top of Castaneda-Martinez, who was on the ground. Emmanuel testified that Jenkins faced Emmanuel, looked directly at him, fired two more shots down into Castaneda-Martinez, and ran to the white SUV and left with the other two men. Accordingly, we conclude that any error was at most harmless. *See Tolliver v. State*, 922 N.E.2d 1272, 1279 (Ind. Ct. App. 2010) (holding that regardless of the admissibility of certain evidence, "two independent eyewitnesses . . . whose testimony was wholly unrelated to and unaffected by" the questioned evidence, "identified Tolliver as the shooter, and [one eyewitness] connected Tolliver to a gun like the one used to kill [the victim]," and that accordingly any alleged error in admitting the evidence was harmless), *trans. denied*.

## Conclusion

[20] For the foregoing reasons, we affirm Jenkins's conviction for murder.

[21] Affirmed.

Vaidik, C.J., and Bradford, J., concur.