## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 25 2018, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kevin Derek Riley,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | May 25, 2018<br><br>Court of Appeals Case No.<br>45A05-1708-CR-1821<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Salvador Vasquez, Judge<br><br>Trial Court Cause No.<br>45G01-1601-MR-1 |

**May, Judge.**

[1] Kevin Derek Riley appeals his conviction of murder.[1] He presents four issues,[2] which we restate as:

> 1) Whether the trial court abused its discretion when it permitted expert opinion regarding handwriting analysis;
>
> 2) Whether the trial court abused its discretion when it denied admission of evidence allegedly showing witness bias;
>
> 3) Whether the trial court abused its discretion when it permitted a witness to testify about the state of mind of another witness; and
>
> 4) Whether the trial court abused its discretion when it denied admission of evidence pertinent to witness credibility.

Finding no abuse of discretion, we affirm.

## Facts and Procedural History

[2] In January 2014, Riley was dating Marian Robertson. On January 13, 2014, they spent the day running errands. They went to a pawn shop and a gas station, where they were recorded by surveillance cameras. Thereafter, they went to another convenience store where they talked to Marian's cousin.

---

[1] Ind. Code § 35-42-1-1 (2007).

[2] Riley was also convicted of Level 4 felony unlawful possession of a firearm by a serious violent felon, but he does not challenge that conviction in this appeal.

Marian's cousin told Marian that Marian's sister, Tamika Robertson, wanted to talk to Marian.

[3] Marian called Tamika, who reported Riley was having sex with April Bailey. Tamika believed April had AIDS. Marian confronted Riley, who denied the sexual allegations. Riley and Marian both contacted April. Subsequently, they drove over the house where April lived with her three children and another couple.

[4] April came outside to talk to Marian. Marian spoke with April in her driveway and in the street near Marian's car. Riley stayed in the car during their conversation. April's son, K.B., saw the women talking. April's daughter, M.B., called out the door to see if her mother was alright and then returned inside. Toward the end of the conversation, April gave Marian a "side hug." (Tr. Vol. 3 at 183.) Marian heard, "Pow." (*Id*. at 184.) Riley told Marian, "Bitch, get in the car . . . Bitch, drive, before I kill you." (*Id*.) They drove away. M.B. and K.B. heard the gunshot and exited the house to find their mother lying in the middle of the street. She had been shot in the face.

[5] Marian and Riley drove to the house of Riley's brother, Mack. Riley went inside while Marian stayed in the car. Then, they drove to the elder care facility where Riley's mother resided. They signed in at 5:30 p.m. Around 8:00 p.m., Marian took Riley to the home of his child's mother, Demetria Morris. Marian then returned to spend the night with Riley's mother at the elder care facility. Marian did not contact the police.

[6] The next day, Marian and Riley ran some errands. Later that day, spurred by a tip, the police arrested Marian and Riley. Marian was interviewed but lied to the police about her interactions with April because she was afraid of Riley. During her second interview with the police, after she was assured the police would keep her safe, Marian told them Riley had shot April. Riley denied having been in contact with April that day. The State charged Riley with murder.

[7] While incarcerated, Riley contacted his brother, Mack, via telephone. He told Mack to retrieve the "twin" from Riley's dresser. (Tr. Vol. 5 at 110.) Officers speculated that "twin" referenced the bullets that went with the gun Riley used to shoot April. (*Id*. at 112.) The police had already executed a search of Riley's residence and retrieved everything from the dresser, including a box of ammunition.

[8] Demetria received a letter from Riley that stated: " . . . you <u>need</u> to let [the police] know that It was still day-light out when I came up there this is very '<u>important</u>' Don't say anything other than I know it was still day light when he came up here." (Ex. Vol. 1 at 35) (errors and emphases in original). Because the envelope had Riley's name on it and the contents of the letter "referr[ed] to his son as Jr.[,]" (Tr. Vol. 4 at 164), Demetria believed the letter to be written by Riley even though she had never seen his handwriting before.

[9] Over Riley's objection, the trial court allowed Courtney Baird, a forensic document examiner with the Indiana State Police, to testify as an expert

witness. Baird compared the letter sent to Demetria with other writing by Riley, specifically "six pages of request known writing and three forms and a half page of non-request known writing."[3] (Tr. Vol. 6 at 171.) Baird indicated the request known writing had indications of an attempt to disguise or distort.[4] However, she was able to proceed to a comparison. Baird determined it was "probable that Kevin Riley . . . was the writer of the letter."[5] (*Id.* at 197.) She explained: "The opinion [']probable['] means that evidence contained in the handwriting points rather strongly towards both the questioned and the known writing, [sic] having been written by the same individual. However, it is short of virtually certain degree of confidence." (*Id.*)

[10] Preston Meux, a friend of Riley, was incarcerated at the same time as Riley. Riley gave Meux a letter to give to Mack. Meux lost the letter while he was processing out of jail. He wrote down what he remembered it to say. He

---

[3] Baird explained that "request known writing" is an example of a person's writing that a "detective has requested . . . from the subject." (Tr. Vol. 6 at 166.) "Non-request known writing" is "writing that anyone produces during the normal course of business or through personal correspondence." (*Id.*)

[4] Handwriting comparison first involves an "examination of the questioned writing[.]" (Tr. Vol. 6 at 185.) Next, the analyst compares "known writing for numerous features." (*Id.*) Such features include the naturalness or distortion of the writing along with trying to discern if the known writing appears to have been disguised and how internally consistent it is. (*Id.* at 185-86.) Once the analyst is satisfied the known and the unknown writings are appropriate for comparison, *i.e.* include enough of the pertinent factors to allow the analyst to determine they are valid, the analyst then compares the known and unknown examples "side-by-side." (*Id.* at 188.) However, attempts made to distort or disguise are known as "limitations" on the analysis. (*Id.* at 187.)

[5] Baird explained the confidence level handwriting analysts use. The scale is a "9-point handwriting conclusion scale. (Tr. Vol. 6 at 168.) Along that scale, going from "identification" to "elimination," (*id.* at 169), is the "point of neutrality" in the middle wherein the analyst will indicate "the evidence is far from conclusive." (*Id.*) If the confidence level builds, the analyst will indicate it is "probable" the writers are the same. (*Id.*) The scale goes the other direction—toward elimination—through the same phases of probability. (*Id.*)

wrote: "Yo Bro said to talk to Marian and tell her don't say shit else and not to show up to court anymore. And if she on that bs, then do what you gotta do. Also if the cops ask tell them that the twin he told you to get out the dresser meant drugs." (Tr. Vol. 5 at 22; Ex. Vol. 1 at 66) (errors in original). Meux wrote this out on the back of a receipt with the reminder: "GIVE TO MACK."[6] (Ex. Vol. 1 at 66.) Meux left the note on the door of Mack's house. Jessica Mitchell, another occupant of the house, retrieved the note and gave it to her mother, Dorothy Robertson, who is Marian's "auntie." (Tr. Vol. 5 at 57.) Dorothy gave the note to Marian. Marian gave the note to Lake County Sheriff's Department Detective Joseph Hardiman. Over Riley's objection, Detective Hardiman testified Marian was afraid because the note appeared to confirm Riley was a threat to her.

[11]    At trial, Riley wanted to question Meux regarding a pre-trial diversion ("PTD") agreement Meux had signed during the pendency of Riley's case. Both the State and Meux said the agreement was not offered as a benefit for Meux's testimony in Riley's case. When the trial court asked Meux about receiving a benefit for his testimony, Meux explained he had not received a benefit for his testimony because, he "had a witness to come forth on that case to say that [he] didn't – [he] was not in possession of a firearm or anything like that. That's why [his] charges was dropped and everything because it was a witness on [his]

---

[6] Meux rewrote the note on the back of two different receipts. On the back of one receipt was the substantive content of the note. On the back of the other was simply the words "GIVE TO MACK[.]" (Ex. Vol. 1 at 66.) For clarity, we refer to these two receipts as one note.

case." (*Id.* at 40) (errors in original). When asked specifically if he had received a benefit from the State for his testimony in Riley's case, Meux unequivocally answered, "No." (*Id.* at 44.)

[12] Rogerick Denham was incarcerated with Riley.[7] He testified Riley and he had formed a friendship and Riley wished him to "demonstrate" on Marian.[8] (Tr. Vol. 7 at 78.) Denham reported Riley's request through an anonymous tip line provided at the jail. Denham told Detective Hardiman that Riley offered to have "some woman" bail him out of jail. (*Id.* at 80.) However, that never came to fruition. Working with police, Denham was released from jail with an electronic monitoring device. Denham said Riley told him who to contact to obtain a murder weapon and to learn how to find Marian. Denham contacted those individuals, but no weapon or information was ever provided.

[13] The jury found Riley guilty as charged. The court imposed an aggregate sentence of ninety-one years in the Department of Correction.

# Discussion and Decision

---

[7] Riley offered evidence of Denham's current charges and Denham's subjective belief he would be treated fairly by the State if he testified in Riley's trial. The State and Denham confirmed Denham had not been given any benefit from his testimony. The trial court denied Riley's request to admit evidence regarding Denham's current charges but allowed Riley to cross-examine Denham regarding his subjective belief regarding future benefits.

[8] Denham testified "demonstrate" means to kill someone. (Tr. Vol. 7 at 78.)

[14] All four of the issues Riley raises assert error in the admission or exclusion of evidence. We review evidentiary rulings for an abuse of discretion. *Pavlovich v. State,* 6 N.E.3d 969, 975 (Ind. Ct. App. 2014), *trans. denied.* An abuse of discretion occurs if the trial court misinterpreted the law or if its decision was clearly against the logic and effect of the facts and circumstances before it. *Id.*

## Expert Testimony

[15] Riley alleges Baird's testimony did not qualify as expert witness testimony because "there is no known or potential rate of error for handwriting analysis nor the existence and maintenance of standards controlling the techniques' operation." (Appellant's Br. at 15.) The State counters[9] it "presented ample foundation for the scientific techniques applied in forensic document examination and the acceptance of those techniques in the relevant scientific community." (Appellee's Br. at 17.) Additionally, the State contends it "presented independent evidence supporting that the letter had been written by Defendant." (*Id.*)

[16] A trial court has discretion to allow admission of expert opinion testimony. *Julian v. State,* 811 N.E.2d 392, 399 (Ind. Ct. App. 2004), *trans. denied.* The court must be "satisfied that the expert testimony rests upon reliable scientific

---

[9] The State contends Riley "does not expressly assert the trial court abused its discretion. Rather, [Riley] simply asserts that Baird could not offer a precise rate of error in the application of established document examination techniques[.]" (Appellee's Br. at 19.) Further, the State contends this is not a cogent argument and Riley's claim is waived. While we agree Riley's argument is sparse, we will address his claim, to the extent it is made, on the merits. *See Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015) ("[W]henever possible, we prefer to resolve cases on the merits instead of on procedural grounds like waiver.").

principles" in order to admit the testimony. Ind. R. Evid. 702(b). A decision to admit evidence will not be reversed absent a showing of manifest abuse of the trial court's discretion resulting in the denial of a fair trial. *Davis v. State,* 791 N.E.2d 266, 268 (Ind. Ct. App. 2003), *reh'g denied, trans. denied.* In determining the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and unrefuted evidence in the defendant's favor. *Id.*

[17] Indiana Evidence Rule 702 states:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

While the United States Supreme Court interpreted the Federal Rules of Evidence pertaining to expert testimony in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592-94 (1993), that interpretation is not controlling in Indiana, although it may be helpful. *McGrew v. State*, 682 N.E.2d 1289, 1290 (Ind. 1997). Indiana Evidence Rule 702(b) "differs from the Federal Rules of Evidence in its express requirement that expert testimony be based upon reliable scientific principles." *Id.* This rule does not "intend to interpose an unnecessarily burdensome procedure or methodology for trial courts." *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001). While requiring

the trial court to be satisfied the expert opinion will assist the fact-finder and is based on reliable scientific principles, the intent behind Indiana Evidence Rule 702 is to "liberalize, rather than to constrict, the admission of reliable scientific evidence." *Id.*

[18] The trial court may determine a principle is reliable: (1) by taking judicial notice of its reliability, or (2) if the "proponent of the scientific testimony provid[es] sufficient foundation to convince the trial court that the relevant scientific principles are reliable." *Steward v. State*, 652 N.E.2d 490, 499 (Ind. 1995), *reh'g denied.* A trial court may consider the following non-exclusive factors when determining reliability:

> (1) whether the technique has been or can be empirically tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error as well as the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance within the relevant scientific community.

*Barnhart v. State*, 15 N.E.3d 138, 144 (Ind. Ct. App. 2014). However, "there is no specific 'test' or set of 'prongs' which must be considered in order to satisfy Indiana Evidence Rule 702(b)." *McGrew*, 686 N.E.2d at 1292.

[19] Here, Baird testified as to her own qualifications as a document examiner and the methods devised to determine whether a particular person produced a particular written document. She is a "forensic document unit supervisor . . . responsible for training and supervision of the members of the unit, as well as conducting examination of document related cases." (Tr. Vol. 6 at 160.) She

has worked in that unit since 2006 and been a supervisor since 2012. She has completed internal training of "over 20 modules, covering the different aspects of forensic document examination, from handwriting examination, indented writing impression examination, physical match, print process, and many other types of examination[.]" (*Id*. at 161.) She has also, "[o]ver the last ten years . . . attended over 35 different workshops and conferences and meetings throughout the country[.]" (*Id*. at 162.) These conferences are sponsored by "organization[s] within [her] field, such as the American Society of – American Academy of Forensic Sciences, The American Society of Questioned Document Examiners and many others." (*Id*.) Baird explained the process undertaken when attempting to determine if a specific writing is attributable to a person, and she used this training and these methods when analyzing the letter Demetria received.

[20]     Baird determined it was "probable" the letter Demetria received was written by Riley. (*Id*. at 197.) She explained that, in this instance, "[']probable['] means that evidence contained in the handwriting points rather strongly towards both the questioned and the known writing, [sic] having been written by the same individual. However, it is short of virtually certain degree of confidence." (*Id*.) When asked about the error rate of handwriting analyses, Baird explained the nature of the cases that analysts work on preclude calculation of an error rate on individual cases, but each analyst's proficiency is tested yearly with standardized samples. She has been tested for the last ten years and has not

failed her testing.  Additionally, her department utilizes internal procedures to check each analysis objectively.

[21]  Riley contends Baird's lack of a "definitive opinion" that Riley wrote the letter, (Appellant's Br. at 15), together with the fact Baird could not give a conclusive error rate for her personal analyses, meant Baird's testimony was lacking in reliability and was not helpful to the jury in determining a fact at issue. However, Indiana Evidence Rule 702 only "requires the trial court's satisfaction that the expert's opinion is based on reliable scientific principles that can be properly applied to the facts in issue." *Person v. Shipley*, 962 N.E.2d 1192, 1197 (Ind. 2012).  Once the trial court was satisfied regarding the reliability of Baird's methods and training, any question as to her conclusions goes to the credibility of her opinion rather than the admissibility of the evidence.  *See West v. State*, 755 N.E.2d 173, 181 (Ind. 2001) (any discrepancy in the actual facts and the expert's estimate goes to weight and not admissibility).  Even if the testimony consists simply of "observations of person with specialized knowledge," *id.*, the trial court does not abuse its discretion when admitting that testimony.  As Baird testified to her credentials and the acceptability of her methods and as the trial court accepted that she was an expert, the trial court did not abuse its discretion in admitting the evidence.  *See Burnett v. State*, 815 N.E.2d 201, 206 (Ind. Ct. App. 2004) (trial court did not err in qualifying witness as an expert after being presented with background on witness experience and training), *reh'g denied*.

# Meux's PTD Agreement

[22] Riley argues the trial court abused its discretion when it did not allow him to question Meux about a PTD agreement between Meux and the State in an unrelated criminal case. He contends Indiana Evidence Rule 616 requires the jury be presented with evidence a witness received a benefit "even on an unrelated case" so the jury may properly weigh the testimony of the witness. (Appellant's Br. at 17.)

[23] While evidence of witness "bias, prejudice, or interest for or against any party may be used to attack the credibility of the witness[,]" Indiana Evidence Rule 616, a "trial court has wide discretion when determining the scope of cross-examination, and only an abuse of that discretion warrants reversal." *Tolliver v. State*, 922 N.E.2d 1272, 1285 (Ind. Ct. App. 2010), *trans. denied*. Our Indiana Supreme Court has determined that "any beneficial agreement between an accomplice and the State must be revealed to the jury." *Id.* Any such benefit "is relevant to the jury's determination of the weight and credibility of the witness's testimony." *Id.* "While confirmed promises for leniency must be revealed, whether in writing or not," disclosure is not required based on the witness's hopes for leniency or if the State denies leniency. *Id.*

[24] Meux and the State signed a PTD agreement in an unrelated case. At trial, Riley first wanted to introduce the agreement as an exhibit. The State objected because although it

recognize[d] that this is a pretrial diversion agreement signed off by the Prosecutor's office, [] neither of those Prosecutors are involved in this case. . . . Although the State was aware [Meux] did receive a [PTD] agreement, [the State] would object to the admission of this as it list [sic] the offenses which can be prejudicial. [Meux] has not been convicted of this.

(Tr. Vol. 5 at 34.)

[25] Riley agreed to withdraw his request to have the PTD agreement entered as an exhibit but requested permission to question Meux about any benefit he received from the PTD agreement. Riley's attorney stated, "When [Meux] testified in July [at a bail hearing], he didn't have an agreement. He testifies and lo and behold he has an agreement." (*Id.* at 36.) The State continued to object because the other case "ha[d] absolutely nothing to do with this case." (*Id.* at 37.)

[26] Without the jury present, the trial court asked Meux about his understanding of whether he was given any benefit from the PTD agreement for his testimony. Meux told the trial court his testimony in the current trial was not discussed when he entered into the PTD agreement "because [he] never benefited from the State." (*Id.* at 40.) Further, he stated he "had a witness to come forth on that case to say that [he] didn't – [he] was not in possession of a firearm or anything like that. That's why [his] charges was [sic] dropped and everything because it was a witness on [his] case . . . not because of [his testimony here]." (*Id.* at 40-41.) The trial court sustained the State's objection and did not allow Riley to question Meux about the PTD agreement. The State then asked Meux,

with the jury present, if he had received any benefit for his testimony to which he responded, "No." (*Id*. at 44.)

[27] Riley offered no actual proof of a benefit provided to Meux. *See Strickland v. State*, 359 N.E.2d 244, 248-49 (Ind. 1977) ("offer of proof must be made in order to preserve an objection to the exclusion of evidence for review"). Riley merely presented the PTD agreement and alleged the agreement demonstrated a possible benefit to Meux for his testimony at Riley's trial. (*See* Tr. Vol. 5 at 36.) Meux's testimony throughout this case, from the bail hearing until the trial, was the same: he was given a note by Riley; the note contained statements about silencing a witness; he lost the note when he processed out of jail, but he remembered the basic contents and where and to whom to deliver it; he wrote out what he remembered; and he delivered his note to the address he remembered from Riley's original note. Riley's speculation about a possible benefit provided by the State to Meux is entirely unsupported and speculative. As such, the trial court did not abuse its discretion when it denied Riley's request to question Meux about his PTD agreement. *See Tolliver*, 922 N.E.2d at 1286 (when basis for the alleged bias is purely speculative and unsupported by evidence, no error when defendant is limited in his cross-examination).

## Detective Hardiman's Characterization of Marian's Fear

[28] Riley gave Meux a note to deliver to Riley's brother, Mack. Meux lost the note but rewrote it from memory. He placed his note on Mack's door where it was found by Jessica, who gave the note to her mother, who gave it to Marian.

Marian gave the note to Detective Hardiman. Detective Hardiman testified Marian was afraid because the contents of the note confirmed Riley would harm her.

[29] Riley alleges the trial court abused its discretion when it allowed Detective Hardiman to testify as to Marian's state of mind when she gave him the note Meux left on Mack's door.[10] Riley says Detective Hardiman did not base his opinion on personal observations or statements from Marian; thus, his opinion testimony was improper. The State counters: 1) Detective Hardiman had already testified regarding Marian's fear of Riley, without any objection based on speculation; and 2) Detective Hardiman's testimony about Marian's fear based on the note "was based on Marian's statements to him and his observations." (Appellee's Br. at 26.)

[30] A witness may testify "in the form of an opinion" if that testimony is "(a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue." Ind. Evidence Rule 701. "Rationally based" means the "opinion must be one that a reasonable person could normally form from the perceived facts." *Davis v. State*, 791 N.E.2d 266, 268 (Ind. Ct. App. 2003), *reh'g denied, trans. denied.* "Helpful" means "the testimony gives substance to facts, which were

---

[10] Riley also asserts Marian shot April Bailey and, thus, was lying to the police about her fear. However, that assertion is an invitation for us to reweigh the evidence and assess the credibility of the witness, which we cannot do. *See Luckhart v. State*, 736 N.E.2d 227, 231 (Ind. 2000) (declining to reweigh the evidence).

difficult to articulate." *McCutchan v. Blanck*, 846 N.E.2d 256, 262 (Ind. Ct. App. 2006).

[31]    Pertinent to the Meux note, Detective Hardiman testified:

> On -- I believe it was April 8th, [Marian] actually contacted me by phone first and she took – to tell me what had transpired. She at that time had those -- those notes written on those receipts in hand. She first took pictures of them and then actually texted them to me so I could see what she had recovered -- or what was given to her.

(Tr. Vol. 5 at 125.) When asked if Marian "had any fears, based on what was written in that note," (*id*. at 126), Detective Hardiman replied, "Absolutely." (*Id*.) Detective Hardiman testified Marian continued to express her fear throughout Riley's criminal proceedings.

[32]    Detective Hardiman based his opinion of Marian's fear on what she said on the phone, together with her statements of fear during the police interrogation and her continuing fear of Riley. Detective Hardiman stated throughout his testimony he believed Marian was in fear—from the time of the police interrogation until "this day[.]" (*Id*.) Because of her fear, Marian lied to the police and did not reveal Riley shot April. When Marian received the note Meux left on Mack's door, her fears were confirmed, *i.e.*, she had feared Riley would do something to her or her family and the note confirmed he was willing to do so. Detective Hardiman's opinion was rationally based on his perceptions of Marian in person and on the phone. His opinion helped the jury understand his own and Marian's actions throughout the investigation. Thus, the trial

court did not abuse its discretion in allowing Detective Hardiman to testify that Marian was afraid when she gave him the note from Riley that Meux left on Mack's door. *See Angleton v. State*, 686 N.E.2d 803, 812 (Ind. 1997) (admission of officer opinion testimony not an abuse when that testimony is "rationally based on [officer's] perception" and helpful to understand the facts), *reh'g denied*.

## Denham's Ankle Monitor

[33] Denham and Riley were incarcerated at the same time. Riley approached Denham for advice and subsequently offered to pay him to kill Marian so no witness would be able to testify against him. Denham reported Riley to the anonymous tip line. Working with police, Denham was subsequently released with an ankle monitor to try to confirm Riley's plans to harm Marian.

[34] Riley advances the theory Denham "had fabricated the information about Mr. Riley to facilitate [Denham's] release." (Appellant's Br. at 20.) Riley asserts the trial court abused its discretion when it did not allow him to introduce evidence Denham had tampered with his ankle monitor and had other pending criminal cases. Riley argues Denham's tampering and crimes were the reason the State terminated its investigation involving Denham and, without that information, the jury would be left with a "false impression" as to why the State terminated the investigation with Denham. (Tr. Vol. 7 at 94.) Riley also argues withholding the evidence of Denham's tampering with the ankle monitor and Denham's other criminal cases would affect the jury's ability to weigh Denham's credibility.

[35]  Detective Hardiman testified they terminated the investigation with Denham not because of Denham's actions but because the trial date was approaching and the State did not want to have to request a continuance. The trial court denied Riley's request to introduce this evidence because the jury was not left with a false impression as to why the investigation was terminated.

[36]  Neither did the jury need the information to assess Denham's credibility. The jury knew Denham had been in jail. Denham's testimony was that he and Riley had talked about Riley's case while in jail together. Denham said Riley told him Riley could get Denham's bail posted so he could get out of jail and "demonstrate" on Marian. (*Id.* at 78.) The bail was never posted. Denham said Riley had given him the name and phone numbers of someone to contact who could get Denham a gun and Marian's location so that Denham could kill her for Riley. Although one of phone numbers worked, Denham was never provided with a gun or a location. Denham's credibility was undermined by the facts that he had been in jail and that nothing he said Riley had promised him actually happened. Riley did not need to elicit evidence of ankle monitor tampering or other criminal charges to undermine Denham's credibility. We accordingly hold the trial court did not abuse its discretion when it denied Riley's request to introduce that evidence.

[37]  Even if we were to assume *arguendo* the tampering and other criminal cases were relevant, the exclusion of that evidence was harmless. Substantial evidence already suggested Riley was attempting to influence or harm witnesses—the note he sent to Demetria, the note Meux delivered to Mack's

house, and Marian's fear of Riley harming her. Denham's testimony was merely cumulative. Furthermore, Denham's credibility was low and, even if believed, his testimony merely underscored the evidence already heard. Any error resulting from the trial court's denial of admission of evidence regarding Denham's credibility likely would not have influenced the jury's impression of Denham's testimony; thus, the error, if any, was harmless. *See McCorker v. State*, 797 N.E.2d 257, 267 (Ind. 2003) (substantial cumulative evidence from other witnesses renders the court's evidentiary decision harmless).

# Conclusion

[38] The trial court did not abuse its discretion when it admitted the handwriting analysis testimony or when it admitted Detective Hardiman's testimony about Marian's fear of Riley when she delivered the note from Meux. The trial court did not abuse its discretion when it denied Riley's requests to question Meux about his PTD agreement or when it denied Riley's requests to question Denham about tampering with his ankle monitor and his other criminal cases. Accordingly, we affirm Riley's convictions.

[39] Affirmed.

Riley, J., and Mathias, J., concur.